Please go ahead. How much time, if any, do you want to try to reserve for rebuttal? I don't think I'm going to need that much time anyway, but let's say five, ten. Okay, very well. It's up to you. Please proceed. Thank you, Your Honors. I think in this case, what we have is fairly straightforward. There are a number of confusing representations on a product. Those confusing representations... Before we even get to that, as I think you know from what we ask you to provide, I'm not sure we have jurisdiction. Will you please explain why we do, based on the citizenship involved, based on the amounts involved? Let's start with the citizenship issue. Why do we have jurisdiction? Well, two of the three plaintiffs certainly are California residents. The defendant corporation is not. Diversity of jurisdiction based on citizenship is straightforward. Based on what do we know that? What evidence? Under the Second Amendment of the complaint, the citizenship of the defendant is not alleged. That is true, but that fact is part of the record by judicial notice in the lower court proceedings and not contested by the defendant. What document? I do not have that at my fingertips. Well, the document that I see, you've got a letter, but it doesn't say anything about citizenship. And the fact that somebody has an office somewhere doesn't tell us anything. What evidence can you point us to that shows that you've got diversity? And I'll be fair. What Mr. Boutro says about that or doesn't say about that has absolutely no relevance to your burden. You bear the burden of proving and pleading. What he says or won't say, what he'll agree to or doesn't agree to, has absolutely no relevance to me. So that's why this is an important question for you. Then I would ask the court to take judicial notice of the information which is publicly Clark is based and has its principal place of business. But that's not what our jurisprudence... Don't you have to show by a judicially noticeable document that you produce what the citizenship is? All you've got here is saying that they have offices somewhere. That doesn't tell us anything. Well, I'm not contesting that in the complaint, there is no allegation to that. The letter, in the letter that you want us to judicially notice, it doesn't help either. Do you, I mean, I do not think it is reasonably contestable where Kimberly Clark is based, Your Honor. If there's a question about what appropriate document the court can take judicial notice of, I am perfectly happy to submit a supplemental document. But this is not something that is a challenge from the standpoint of judicial notice. Well, as I'm sure you know, we have a sua sponte obligation to determine jurisdiction, whether people raise it or not. In this case, you've got the diversity issue, and then you've got the issue of damages. If we get to that, you're talking about minuscule... If you were to prove your complaint, you've got minuscule numbers of people or of dollars involved. How do you get to $5 million? Under what circumstances could you possibly reach that? Well, that's only one of the bases. No, I understand that, but I'd like you to address that one, please. Well, given how much this is being contested, I don't think there's a challenge that there could be a very significant amount of money for attorney's fees. But you have the burden to show that, do you not? And there's nothing in the complaint, you don't say we meet the jurisdiction because we're going to get more than $5 million. There's just nothing there, and that's your burden. And the defense says that we're permitted to rely on a chain of reason that includes assumptions to calculate the amount in controversy. But that's only here when it's on removal from the state court. That's the only thing it says in those cases. We're not on removal in this case. You filed it dead set right here. We can't look at the removal cases to give you jurisdiction as to the amount in controversy. Well, I'm not opining one way or another on the sufficiency of removal cases. What I am saying is that it is not an unreasonable interpretation of a complaint where one asks for punitive damages, where one asks for attorney's fees, one asserts a class action, and one asserts that there are many, many individuals involved. It is not unreasonable to get to that number. I don't have to prove with respect, but I will. But frankly, you should sign me a case that says that, and I don't find it. That's a good argument for you to make because you have to, but find me a case. You didn't even sign me a case that says that. No, it isn't there. It is your burden to allege it. It is your burden to allege it. Merely allege it. You don't even have to prove, but you didn't allege anything. That's the problem. I understand what you're saying, but if the real concern is can you not divine it from the complaint, the standard with respect with which you should approach the is whether it is reasonably inferable. There's no magic to saying... What says that? When you can't even allege simply that the amount of controversy exceeds the threshold limit, that's what I've seen in other complaints, and you didn't even allege that. How can I... What case will get me to that? But I understand your argument. I'm just saying it's really sounding on deaf ears. So you're saying we should infer, based on the allegation that this is a going to be a class action, that you're seeking attorney's fees and seeking punitive damages that is more than five million dollars? That it is not unreasonable. Yes, that is the standard. And what case would you cite that says that's sufficient? I do not have a case at my fingertips right now. There isn't any. There isn't any. You have to plead it, and you haven't pled it. You're saying that we basically have to infer by cobbling together these elements, the punitive damages, etc., etc., etc., to get to the total amount. You have to at least allege it. Yes, but that doesn't have... that I meet that. You can reasonably look at what is in the complaint. You're saying that the court has to infer, based on its own analysis of the merits, that you have some reasonable chance of reaching that. As my colleague pointed out, if you just said, you know, when you add everything all together, it's going to be more than six million dollars. At least there's an allegation. If I had to do this again, would I say it? Of course I'd say it. But your standard is not, do you have to infer it? Your standard is, is it reasonable? No, the standard is not that. The standard is, what do you have to plead for us to have jurisdiction? And that's what we're missing here. I don't... I think I may be talking past you. I recognize that that is a burden that the plaintiff has. What I disagree with is that it has to say, I plead X. You can look at the complaint and if the complaint is reasonably permissible to support that allegation, your job is done. You do not have to make me say the words. But that completely eviscerates the statute. Why would anybody ever have to plead any amount? You just say, just look at the complaint and you can reasonably infer what it would be. That's not what Congress said, is it? No, that's not true. If, for example, I didn't allege a class action, if, for example, I didn't allege punitive damages from the face of the complaint, you could not reasonably infer the jurisdiction. Well, I see these kind of cases with these allegations in district court and most of them don't get to $5 million. So how are we supposed to infer just simply because of those allegations we're at $5 million? That's not the standard. The standard is, is it not possible? It's not, is it likely? What you are supposed to do with respect is look at the complaint and say, based on these allegations, is it not possible? Then we don't have jurisdiction. That's an amazing statement. So you're basically saying the burden is on the court to determine whether, based on the pleadings and the merits of your claim, whether it's possible that you could reach it, that the standard is met. That completely eviscerates the statute, does it not? No, because I need to make factual allegations upon which that possible determination can be made. But then you're asking the court to basically, based on the pleadings, to evaluate the potential of the merits to get there. And that's not what we're required to do, is it? I would say in response, what you're arguing is that it is a very formulistic task that you have. That's what we do. No, I don't think so. I think you're supposed to actually look at what's in the complaint rather than labels. Do you want to save any of your time? It's entirely up to you. You've got five minutes left. If you want to keep going, please do. Address the claim? I think I will at this point in time, because I don't know what is on your honor's minds with respect to the substance. I will then stop and do the rest in rebuttal. Very well. Okay. Let's hear then from, I guess, Mr. Boutros. Thank you, your honors. Good morning. May it please the court, Theodore Boutros for Kimberly-Clark. I'll start with jurisdiction. We respectfully submit this court has jurisdiction under the Class Action Fairness Act, which was enacted precisely to prevent or to protect defendants and give them a federal forum in a class action that purports to be national in scope. Let me ask you this, Mr. Boutros. I think the merits of the case, you have an easy case. But I think you've got a jurisdictional problem. So walk us through, how can we retain jurisdiction to come up with an answer in the merits based on what you know are the two issues? Walk us through. One, two, three, four, five. What do we do to keep this case that allows you to get to the merits? Absolutely, your honor. First, the district court did find Catholic jurisdiction at ER-7 in diversity jurisdiction. Your honors were asking about where in the record the court took judicial notice. It's at ER-147, which was the original dismissal order. And the court cited the 10-K from Kimberly-Clark. And it's undisputed. It's an out-of-state company with its home elsewhere in the state of incorporation. So I think there's diversity under the lenient standards of the Class Action Fairness Act. Okay. But as you know, the one that I think was attached to Exhibit 1 to the Second Amendment complaint, that doesn't really establish Kimberly-Clark's citizenship. Where in the documents does it show the citizenship? It shows where some offices are. Where in the documents do we see that? Your honor, I have to agree that the plaintiff shown here was, to say the least, flimsy, nonexistent. I can't defend it. And same on the merits, if I get to that. But we did submit a declaration under 28 U.S.C. Section 1653, which specifically allows the court to allow, on appeal, supplemental pleadings to show jurisdiction. Okay. And that's what I want you to do is go there. Yes. Okay. That's our road map. Let's go there. What do we do, complying with that statute, to give them an opportunity to do the pleadings that you think are necessary to keep this case here? Your honor, I don't think that they have to do anything else. That we, under the Class Action Fairness Act, and I'd point to the St. Paul Mercury insurance case you were asking about, amount in controversy. There, the Supreme Court said that where the plaintiff originally files in Federal court, the standard is even more lenient. That's on amount in controversy, that there has to be no, to a legal certainty, the amount in controversy has to fall below the level. But in this case, I mean, what do they say, $0.99 or $1.49 or something like that? How do you get to $5 million? I mean, you gave them, what, $6 million to the whole world, but we're not talking about the whole world here. How do you get, rationally, to $5 million? It flows from the allegations of the complaint, which seeks a U.S. national class, every single purchaser, this is what they're alleging, in the United States from the beginning of time of the sale of this product, so it's a three-year period, across the United States, it seeks full refund. We think that's absurd, but that's what the complaint has put in controversy. And it's saying that they should get full refunds for the complete amount of the purchase price, and our declaration under Section 1653, from Mr. Ramlett, states that that's $6 million in terms of the full amount. So that gets us to $5 million and above. So you think that the $6 million figure you gave to them flies, basically? Absolutely. And under St. Paul Mercury Insurance from the Supreme Court, unless to a legal certainty it doesn't fly, then there's the we-meet-the-amount-in-controversy standard. And I think, you know, in here, we're to, under the Class Action Fairness Act, unlike under ordinary circumstances, the statute says we aggravate the claims of the individual class members. We think the claims are baseless, but we assume, based on the complaint, and make inferences from the allegations of the complaint. That's the Court's Perez decision, this Court's decision. And we're allowed to extrapolate so we can stay in Federal court. And CAFA, the Class Action Fairness Act, was meant to protect defendants, give us a Federal forum, rather than going back to State court where the standards are looser, not as well defined. But again, as you very well know, CAFA, where you have State court involvement, this case was filed in Federal court. Doesn't that make a difference? I don't think so, Your Honor, for these purposes. I think CAFA can give original jurisdiction, diversity jurisdiction. A plaintiff can choose to file and obtain diversity jurisdiction under CAFA in the first instance. And that's what happened here. We know we can't stipulate to jurisdiction in the court. You know, I understand now, in retrospect, the court looking at this and saying, how does we go? What's our basis for jurisdiction? But it really is important. We've been litigating these issues. Their the claims, if we're back, if we go back to State court, we'll remove. You know, we'll be back up here. And we will say their claims, you know, based on the way they've defined them, create diversity jurisdiction, and they're seeking punitive damages, statutory damages. And in these cases, plaintiffs argue that damages should be 10 million, 20 million, 50 million, 100 million. You look at the settlements. Kennedy. I thought they have to state that, don't they? They usually do, but we are entitled under Section 1653. It's a pretty unusual provision, on appeal, to put in evidence so that we can get the Federal forum that Congress said we were entitled to. And that's all we're asking for here. The parties have litigated this. We've spent a lot of time and effort. It would just prolong things. I wouldn't urge the court to keep jurisdiction if I didn't think it had it. But I think that under the Class Action Fairness Act, which was specifically a remarkable bipartisan piece of legislation that was meant to stop — There's a lot of that in Washington. It's been a while. But those were the days. And it was meant to put a stop to this sort of class action that purports to be national, that's seeking big dollars, that brings in a foreign — an out-of-state corporation into State court where the rules are different, there's no 23-F appeal. And so that's why we think it's just crucial that we should be able to stay in Federal court under the Class Action Fairness Act and obtain a ruling on the merits. So from your perspective, there is enough under at least the construction of CAFA that you have to keep this here. To do otherwise would be a complete waste of time, you're just basically starting all over again, and sooner or later you have to get to the merits, and that's what you want, right? Exactly. I gather they do, too. I think they do. Counsel didn't argue on the merits. I think I know why, because their claims are baseless. But we're here in Federal court, and if we go back to State court, for example, or the court dismisses with prejudice or sends it back to the district court, we're going to be back up here. We're fully briefed. And again, I completely understand the court's desire not to take jurisdiction where it doesn't have it. But I go back to the Class Action Fairness Act. It was meant to change the rules precisely because of class actions like this one that are flimsy. So from your perspective, 1653 and other provisions allow us to keep that. We may need to give them an opportunity to amend, right? To make the allegations that are necessary? You don't even think that's necessary? I don't think it's necessary, Your Honor. I think the defendants, and in some of the cases that we've cited from this Court under 1653, the defendants put in evidence to show the amount in controversy. I think it's the general dentistry case. The Blue Ridge case was the diversity question. And the Court said, you know, no purpose would be — nothing to be gained by going back to the district court. This Court could, on a cold record, which is what would happen in the district court, just look at the declaration we submitted, find, yes, there's diversity, yes, there's $6 million in controversy. Before we even get to punitive damages, statutory damages, attorneys' fees, it adds up even when you have what we believe are substantively baseless claims. So we think the Court should keep — it has jurisdiction. It should move to the merits and — and affirm the dismissal below. Okay. I think we have your position on that. Thank you, Your Honor. And I gather you don't like their position on the merits either. I don't. So I will — I will move to that. Somewhat like jurisdiction, the — the plaintiffs did not even cite the correct legal standards. First, they cited Iqbal and — the Iqbal decision from the Supreme Court on the most basic principle. What's the standard on 12b-6? They say it's nonsense, and they have a big quote that they purport is from the Iqbal majority, but it's actually from the dissent. The standard is not, as plaintiffs put it, nonsense. It's plausibility, as this Court well knows. And this Court has repeatedly affirmed dismissals under the 12b-6 case provision in this exact context, consumer labeling, the McGinnity case, the Whiteside case, which they don't even cite in their brief, in their opening brief. And even when we briefed it in our brief, the reply brief is one paragraph. It doesn't cite a single case. It's basically a default on briefing. They don't — the published precedential decision from this Court that catalogs all the prior decisions and sets a standard that they do not even try to meet in their brief. So on that basis alone, the Court should — should affirm. The — and then if we get to the merits. So the test under Whiteside and — and the cases that came before it is, generally, with the reasonable consumer test, the Court — the consumer, we assume, should look at the whole context, the whole package, common sense. There should be — the plaintiff has to show that there's a meaningful capacity to deceive a significant number of membership of the public. And the only time you can't look at the full package is where the front label is unambiguously deceptive such that it makes a specific promise that would mean the consumer has no reason to look at the back. Here, it's all the opposite of that. The Kleenex wet wipes front label is accurate and truthful. There's no claim that it doesn't wipe away 99 percent of the germs. There's no claim that it says it kills germs. There's no claim that it doesn't — that it uses harsh chemicals. It says no harsh chemicals on the front label. There's nothing to suggest it's a germicide. The plaintiff's point to — So, therefore, the front lane — the front label is unambiguous. It's unambiguously accurate. Right. As opposed to unambiguously deceptive. They don't claim that it doesn't do the things it does. They claim that a reasonable consumer would have been some sort of comparative advertising expert who would know about all these other products and would decide that because the color of the label is orange, that that meant it was a germicide because hospital soap is orange. I didn't even know that before I got into this case. So it's a series of illogical inferences, speculation, idiosyncratic views of the plaintiffs, and that's not the reasonable consumer test. It's what would a reasonable consumer interpret from the label. And here, a reasonable consumer would assume there's no harsh chemicals, which is true, that it wipes away the germs. It doesn't kill them on contact. And it even has wipes away again in capital letters after they're wet wipes. And it says no harsh chemicals. Then when you — if you do go to the back, it confirms and amplifies these same features. It talks about the cleansing power of water. It says anytime, anywhere. It's safe on skin. It's dermatologically tested, hyperallergenic. It's alcohol-free, paraben-free. It says no harsh chemicals, no chemicals. So it confirms what's on the front label. And a point I really want to emphasize is consumers view that as a big plus. The Whiteside case, the argument was it said it was plant-based, all natural, and then there were some synthetic ingredients. Here, the fact that this was marketed as a product that had no harsh chemicals, that's something a lot of people want. And the plaintiffs say, well, gee, all you're getting is the ability to wash your hands at a sink. No, the whole point of the product is you can wash your hands with soap and water anywhere you are. The convenience of that with a natural, non-harsh chemical product. They admit there are no — there's soap and water, even according to the plaintiffs. And they point to COVID, which I do want to address, because, first of all, the product was put on the market before COVID. Secondly, I think we all remember that the big mantra during the early days of the pandemic and throughout was wash your hands with soap and water. Sing happy birthday while you do it. So the ability — the fact that a product was put on the market that would allow you to do that anywhere you were, out in the country, anywhere in the — you know, in your office, whatever, that's a beneficial product. And they — there's some insinuations this was some sort of scam to trick people into thinking this was a germicide. And that just — there's no plausible allegations that suggest that whatsoever. And it's counter to common sense and, I think, to everything we know. And I'll just maybe finish with — They use the historical idea of COVID to say that they don't need to really prove so much misunderstanding, that it's a relaxed standard of reasonableness is their only proof necessary. How do you respond to that? There's — they don't cite a single case for that. It's not correct. And, in fact, it really sort of proves the opposite. If people were hyper-concerned with removal of germs or killing germs, then they would have been more vigilant to see what the product — to read the label. And that's what the — I think the Trader Joe's case from this court says. Well, and not only that, but did you target this product to a particularly disadvantaged group? No. And we didn't target it to COVID. Or a vulnerable group? No. We did not, Your Honor. And it's a great — it was a great product. And the fact that washing your hands during COVID, it really struck me as I was coming down the pike here to the argument that that was a big advice from everyone. Wash your hands with soap and water. That's what these products allowed you to do anywhere you were. And so this case is baseless on the merits. We respectfully submit the court has jurisdiction. We would like to stay in federal court to avoid the ping-ponging back and forth again and very much appreciate the argument time today. Thank you very much. Thank you for your patience and waiting. Any questions about my colleague? I think not. Thank you. All right. Thank you. So, Mr. Rosenberg, you've got a little time. Thank you, Your Honors. I think we could recognize that someone who is selling soap is not going to advertise that their product is safe. Someone who is selling soap is not going to argue that they don't have harsh chemicals. They are trying to skim under the difference between what's alcohol and what's soap. They use all of the alcohol language, the 99% stuff. They specialize in getting rid of germs. And yet it's just soap. But it doesn't say it's just soap. And they want you to pay extra money for something which will get you what alcohol does, but it isn't quite alcohol. And that's not the same thing. The standard you have to deal with is the reasonable consumer. Absolutely. You're basically saying the reasonable lawyer. That's different. No. Why would the reasonable consumer, for example, think that an orange product contains germicides, which I think you're alleging? Why is that a reasonable? Well, I have 10 plaintiffs who said so. Now, I suppose a judge could say they're all wrong. Just because you have 10, that doesn't really say anything. 10 isn't an acceptable number of what you have to have for this kind of misleading evidence. Well, we're talking about what's reasonable. And right now we have the question of what a judge thinks is reasonable versus 10 consumers. Did you get an expert that said anything? Not yet. So you're saying that they were misleading and they were suggesting their product contained alcohol, but doesn't the product say it does not contain alcohol? I am saying they suggested it was alcohol-like. They advertised it as being just like what you'd have in the Purell hand sanitizers, but it doesn't have any of that nasty stuff. They certainly didn't advertise it was soap. They didn't advertise that these were like picnic wipes. And they asked a premium for it. Why do you suppose they did that? There's a case, which I don't think either side cited, but I will mention it because I think it's particularly relevant. Did you file a letter to us to mention that case to us? No, and I won't mention it if you think it's inappropriate. Why don't you give it to us? You haven't got much else, so let's see what you got. It's Joe versus Kimberly Clark, 2013 U.S. District Lexus, 173216. It says, the issue is not whether the unmodified use of pure and natural is devoid of meaning. It is which meaning a reasonable consumer would ascribe to it. The court concludes, this is not a question that can be resolved on a Rule 12b-6 motion. With respect, when California came up with its consumer protection statutes, it was not looking for a panel of judges to say, no, we don't think so. But how do you determine what the reasonable consumer is then? I think you have to be expansive and understanding as a human being. I think you have to put yourself in a position of people struggling at a time of COVID, looking at a package, which has got all sorts of stuff, which is confusing. And now you say, I'm being a lawyer. You're saying that a reasonable consumer, all calm like, is going to sit, look at this product, say, let me just study and read all the labeling before I make a decision. Counsel, with respect, I think you heard Mr. Boutros say this product was produced well before COVID, wasn't produced specifically for COVID. And if you look at the front of the package, it's not confusing and it's not ambiguous. But if you do look at the back, it's even more clear. I guess I'm just struggling with where the reasonable consumer would assume any of the things that you're alleging about this product based upon what you see at the front of the package. What am I missing? What you're doing is you're putting yourself at the position of being a jury. The allegations say what a reasonable consumer thinks about a 99% representation. What a consumer thinks about alcohol as a successful product. What it thinks about killing on contact, not by scrubbing. These are allegations that 10 people believe. What 10 people? I'm sorry? What 10 people? The 10 original plaintiffs in this case. We're down to three now because of jurisdictional questions. But the facts are still alleged. They're still in the record. All right, your time is up. Let me ask whether either of my colleagues has additional questions. I think not. We thank all counsel. The case just argued is submitted. The court stands adjourned for the day. Thank you.
judges: SMITH, SMITH, Rayes